TATE, Judge.
The plaintiffs, a driver and his collision insurer, appeal from the dismissal of their tort suit. The chief issue is whether the trial court committed manifest error in holding that the plaintiff driver was con-tributorily negligent because of excessive speed.
The suit arises from an accident occurring after dark at 9:00 P.M. on July 30, 1962. It took place in the open country On Louisiana Highway 10, a principal state route between Opelousas and Alexandria.
Immediately prior to the accident, the plaintiff St. Amand was driving south towards Opelousas. At that time, a large truck-trailer owned by the defendant Petro Sales and driven by its employee James (made co-defendant) was backing from the opposite (northbound) lane across the southbound lane into a side-road to the west of the highway.
The negligence of Petro Sales through its employee James is clearly shown. With bright headlights facing northward, the truckdriver James was slowly (at 3 mph) backing the long trailer-tank of his vehicle into a little side-road to his left (i. e., on the west, or southbound, side of the highway) and obstructing the entire travelled surface of the roadway.[1] Thus, for most of the plaintiff St. Amand’s approach, he was faced by the bright headlights of a truck in the opposite lane apparently approaching him, although these bright lights obscured from him that, in fact, his entire lane was obstructed by the long and heavy tank-trailer, relatively high off the ground.
Additionally, because of the automatic dimmer on the Cadillac, St. Amand’s headlights had flicked onto dim in reaction to the truck’s bright lights. The Cadillac’s headlights thus shone under the tank-body of the truck. This was corroborated by the truckdriver’s testimony, who was watching to his left and rear and did not observe the oncoming Cadillac until he heard the squeal of its brakes. The truck-driver admitted frankly that he did not see any reflections of the approaching head *401 lights on the watched white tank of his tractor-truck as St. Amand approached.
Thus, St. Amand in approaching was free of contributory negligence, insofar as he failed to observe that his way was completely obstructed by the large trailer-tank backing across the highway. There were no observable flares or signals or signal lights, and the three side-clearance lights, spaced 9 to 12 feet apart along the tank, were not calculated to attract his notice, being situated some 7-8 feet above the ground. A night driver is not negligent for colliding with an unexpected and obscured obstacle negligently obstructing the travelled lane of the highway which he could not have reasonably anticipated or perceived sooner. Suire v. Winters, 233 La. 585, 97 So.2d 404; Vowell v. Manufacturers Casualty Ins. Co., 229 La. 798, 86 So.2d 909; Sittig v. Southern Farm Bureau Cas. Ins. Co., La.App.3d Cir., 198 So.2d 514, and many decisions therein cited.
In holding the plaintiff nevertheless con-tributorily negligent, the trial court found that, if he had not been exceeding the speed limit, he could have stopped in less than 150 feet and thus have avoided the collision.
By actual measurement of the plaintiff’s skid marks, the preponderance of the evidence shows that he applied his brakes some 158 feet prior to the impact. The front of his car smashed into and under the tank-trailer, making the Cadillac a total loss (because the cost of repairs would exceed its value).
The trial court concluded, after holding that the Cadillac could have stopped within 150 feet: “Apparently, the plaintiff saw the truck at a considerable distance from the point where the collision occurred because in addition to the skidmarks, the force of the impact demonstrates that his car would have skidded a considerable distance beyond the point of impact, demonstrating that he was bound to have been exceeding the speed limit.”
The essential basis of the trial court’s holding of excessive speed is its finding that the plaintiff could have stopped his automobile in less than 150 feet from the time the brakes were applied, if he had not been exceeding the speed limit. This finding is based on an unofficial test conducted for the defendants’ counsel by a planter and a deputy sheriff some two and a half years after the accident. By the test, a 1963 four-door Cadillac was speeded to 60 miles per hour and then, at a signal, braked suddenly. The skid marks on the highway were then measured and shown to be 132 feet.
It is to be noted that no effort was made to verify that the braking efficiency of the Cadillac used in the test was the same as that of typical of other Cadillacs, such as the 1962 two-door Cadillac involved in the present accident. Furthermore, the measured braking distance was entirely on the travelled surface of the roadway in question (which was not necessarily in the same condition as on the date the present accident took place), whereas the testimony of the investigating state trooper and of the defendant’s insurance adjuster shows that some one-fourth to one-half of the brake marks made by the vehicle involved in the accident were on the graveled shoulder.
If uncontradicted, no error might have been committed by the trial court accepting the results of the test as proving preponderantly that the plaintiff’s vehicle could have stopped and avoided the accident if proceeding at a lawful speed. However, in giving this unscientific test such great weight, our trial brother overlooked other testimony in evidence of greater weight.
On cross-examination of the state trooper, the defendant introduced a speed chart produced by the Louisiana Department of Public Safety showing that vehicles with brakes of the efficiency required by Louisiana law should be able to bring to a stop in 185 feet from the spot *402 the brakes are first applied.[2] See D-14 at Tr. 124. Further, the testimony of the State Trooper also shows that the skid marks of a vehicle would be even longer where the wheels were partly on gravel instead of entirely on pavement, as in the present case. See Tr. 118 to 123.
In according such preponderating weight to the unofficial and unscientific braking test, we find that the district court overlooked the burden upon the defendants to prove contributory negligence by a preponderance of the evidence. Deshotels v. Henry, 245 La. 23, 156 So.2d 465; Demerest v. Travelers Insurance Co., 234 La. 1048, 102 So.2d 451.
The plaintiff’s own sworn testimony is that he approached the scene of the accident at a speed of between 55 and 60 miles per hour. The preponderance of the evidence, including the testimony of the investigating state trooper and also the speed charts introduced into evidence, shows the physical facts of the accident to be consistent with this version; for we find the trial court incorrectly found, by giving undue weight to the unscientific test, that the plaintiff could have stopped before the impact if indeed he had been going 60 miles per hour.
We do not find the effect of the impact under the circumstances to indicate any excessive speed. In the absence of testimony other than our own unscientific assumption, we cannot say that the demolition of the Cadillac, which went under the belly of the tank since its bumper was much closer to the ground, is inconsistent with the sworn speed of 60 miles per hour. See e. g., Steele v. State Farm Mutual Insurance Co., 235 La. 564, 105 So.2d 222.
We therefore find that the trial court committed error in holding that the defendants had borne their burden of proving contributory negligence by way of excessive speed on the part of the plaintiff driver.

Quantum ,

As a result of the collision, the plaintiff St. Amand’s automobile was unrepairable, and he himself suffered fairly serious personal injuries, with some permanent residual.
St. Amand sustained injury to the knee, extensive face laceration, and mild cerebral concussion. The accident aggravated a prior knee condition and produced a 10 per cent permanent disability of the knee, because of pain on climbing, squatting, or walking on uneven ground, required by his occupation. Also residual are minimal face-scars. He had a condition of disturbance of equilibrium for several months after the accident, a residual of a post-concussion syndrome.
*403 While St. Amand was in the hospital only eight days, he remained under medical treatment through November of 1962, with gradually decreasing disability. He was first house-bound, then moved more extensively, although with difficulty and pain.
He was, however, almost completely restricted in activity some four to five weeks. Since this initial period of fullest disability was during a busy time of making the 1962 crops, St. Amand claims substantial damage resulting from crop losses.
The evidence shows that St. Amand was one of the larger St. Landry Parish planters. At the time of the accident, he had 600 acres of rice under cultivation and 600 acres of soybeans. He was personally supervising and participating in the raising of these crops, with the aid of some six or seven day laborers.
He produced evidence, based on the testimony of the county agent and of his own tax accountant, attempting to prove damages of $16,500 loss of soybean crop and $23,000 loss of rice crop, by way of yield.
These estimates were based on a comparison of the gross crop receipts for the years 1961, 1962 and 1963. The county agent also verified that loss of supervisory agility at the time this occurred would be difficult to replace and would probably have some consequence in reduced crop yield.
On the other hand, we do note that the 1962 crop year were generally poorer, due to drouth conditions. Likewise, the raw conclusions of the accountant, based on alleged total acreages raised and crop receipts in the respective years, is not corroborated by specific information as to respective quantities grown, prices for the years in question, or other specific data. Likewise, during the year 1962 St. Amand leased and attempted to grow crops on some additional acreage not cultivated by him in 1961 and 1963. The increased expenses between 1961 and 1962, and the perhaps reduced crop yield through the lesser fertility of different acreages would, of course, reduce the alleged loss of yield-per-acre for the 1962 crop.
In our opinion, the plaintiff St. Amand has not preponderantly proved any loss of yield due to his decreased supervisory ability because of his accident-caused injuries.
We therefore find an award of six thousand five hundred dollars general damages will adequately compensate the plaintiff St. Amand for his initially serious and painful injuries, his relatively minor permanent knee-disability residual, and his minimal facial scarring.
As for special damages, the evidence proves:
(a) The loss of the Cadillac, $5,175 paid by the collision insurer (Aetna) and the $50 deductible paid by St. Amand;
(b) Medical expenses, $937.73 ($341.23, Opelousas General Hospital; $111, Dr.» George Bourgeois; $69, Alexandria Orthopedic Clinic; Dr. Attaway, $142; At-taway Clinic, $283.50).

Decree.

For the foregoing reasons the judgment of the trial court is reversed, and we render judgment in favor of the plaintiff Milbert St. Amand and his co-plaintiff, Aetna Casualty & Surety Co., against the defendants Petro Sales, Inc., Robert Lee James, and their liability insurer, the Tri State Insurance Co., holding said defendants solidarily liable in the' following amounts: (a) Five Thousand One Hundred Seventy-five and No/100 ($5,175) Dollars, together with legal interest thereon, in favor of the co-plaintiff, Aetna Casualty & Surety Company, together with legal interest thereon; and (b) Seven Thousand Four Hundred Eighty-Seven and 73/100 ($7,487.73) Dollars, in favor of the plaintiff, Milbert St. Amand, together with legal interest thereupon. *404 The said defendants-appellees are to pay-all costs of these proceedings and of this appeal.
Reversed and rendered.

. The truck was in a jack-knifed position, with the truck facing northward and the long trailer-tank east-west across the highway backing into the side-lane.

. The figures were derived from research and experiments by the Louisiana agency. The stopping chart itself would not be admissible if objected to, if not testified to by a witness who conducted or verified the experiments and measurements. Guidry v. Grain Dealers Mut. Ins. Co., La.App.3d Cir., 193 So.2d 373.
However, the defendant introduced them into evidence, and the plaintiff noted that he would object to its admissibility only if the defendant objected to the admissibility of certain speed charts to be introduced by him. Tr. 121-122. The defendant did not object to the introduction of these speed charts at the time the plaintiff introduced them. Tr. 270. (These latter charts, incidentally, showed that brakes of the efficiency in question would produce skid marks of 298 feet before bringing to a stop a vehicle proceeding at 60 miles per hour.)
We further note that the distance of brake marks will vary according to the gripping efficiency of the brakes and of the particular surface of the highway involved. For instance, in commonly accepted stopping charts, the braking efficiency of fair to good brakes in stopping a vehicle from 60 mph, may produce skid marks of between 185 and 240 feet; while brakes of 100 percent efficiency, which produce “violent” stopping, are shown as producing skid marks of only 120 feet. See Am.Jur.2d, Desk Book, Documents 173-176; 1 Blashfield Automobile Law and Practice Section 3.3 (1965).